# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GARY L. STOUFFER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 02: 11-cv-00096 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER OF COURT

February 7, 2012

**I.    INTRODUCTION**

Plaintiff, Gary L. Stouffer, brought this action pursuant to 42 U.S.C. § 405(g), for judicial review of the final determination of the Commissioner of Social Security ("Commissioner") which denied his application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401 – 433 ("Act"). This matter comes before the court on cross motions for summary judgment. (ECF Nos. 8, 10). The record has been fully developed at the administrative level. For the following reasons, Plaintiff's Motion for Summary Judgment will be DENIED, and Defendant's Motion for Summary Judgment will be GRANTED.

## II. PROCEDURAL HISTORY

Plaintiff initially filed an application for DIB, in which he claims total disability since December 1, 2007. (R. at 112 – 14)[1]. An administrative hearing was held on October 19, 2009, before Administrative Law Judge Marty R. Pillion ("ALJ"). Plaintiff was represented by counsel and testified at the hearing. Irene H. Montgomery, an impartial vocational expert, also testified at the hearing.

On November 11, 2009, the ALJ rendered an unfavorable decision to Plaintiff in which he found that Plaintiff retained the ability to perform sedentary work, with certain restrictions and, therefore, was not "disabled" within the meaning of the Act.

The ALJ's decision became the final decision of the Commissioner on December 20, 2010, when the Appeals Council denied Plaintiff's request to review the decision of the ALJ.

On January 26, 2011, Plaintiff filed his Complaint in this Court in which he seeks judicial review of the decision of the ALJ. Defendant filed his Answer on April 1, 2011. The parties have filed cross-motions for summary judgment.

## III. STATEMENT OF THE CASE

### A. General Background

Plaintiff was born March 20, 1965 and was forty four[2] years of age at the time of his administrative hearing. (R. at 31). He lived with his wife and two sons in a split-level home. (R. at 32). Plaintiff graduated high school and completed approximately one-and-one-half years of vocational training in refrigeration, air-conditioning, heating, and plumbing. (R. at 33). His last full-time job was as a supervisor/ carpenter with his brother's contracting company. (R. at

---

[1] Citations to ECF Nos. 6 – 6-8, the Record, *hereinafter*, "R. at __."

[2] Plaintiff is defined as a, "Younger Person." 20 C.F.R. §§ 404.1563, 416.963.

33 – 36). He was laid off from work in December 2007 – around the time of his claimed disability onset. (R. at 33). Plaintiff's primary source of income since then has been his wife, but he receives medical benefits through the state. (R. at 32).

Plaintiff's disability application indicated that he was not able to work due to symptoms related to diagnosed Multiple Sclerosis ("MS"), including persistent weakness, severe pain, dizziness, slurred speech, and fatigue. (R. at 141 – 52, 166 – 67). In a self-report of day-to-day functioning, Plaintiff stated that his activities were typically limited to taking his children to and from their school bus, helping with school work, watching television, and preparing simple meals. (R. at 166 – 76). He was able to spend up to four hours a week mowing his lawn with the aid of a lawn tractor. (R. at 166 – 76). Plaintiff usually left the house twice a day, was able to drive a car, and was able to shop for necessary items. (R. at 166 – 76). He had no problems paying bills, counting change, and handling savings/ checking accounts. (R. at 166 – 76). Plaintiff was still able to engage in hobbies such as fishing, coaching, and working with the cub scouts. (R. at 166 – 76). He was limited, however, by his need to sit more frequently. (R. at 166 – 76). Plaintiff tried to attend church every week. (R. at 166 – 76).

Plaintiff claimed that he had been laid off from his last job because he was not able to keep up with his work. (R. at 166 – 76). He claimed to need a cane to ambulate, although it had not been prescribed. (R. at 166 – 76). Plaintiff's MS-related symptoms were allegedly progressively worsening. (R. at 166 – 76).

**B. Medical Background**

Plaintiff appeared at the emergency department of Latrobe Hospital in Latrobe, Pennsylvania on May 15, 2007. (R. at 208 – 09, 215 – 20). He complained of numbness on the right side of his face, beginning at the corner of his mouth, moving towards his ear, and

terminating at his scalp. (R. at 208 – 09, 215 – 20). An examination of Plaintiff was unremarkable, with the exception of his claimed facial numbness. (R. at 208 – 09, 215 – 20). Plaintiff had proper reflexes and his cranial nerves were normal. (R. at 208 – 09, 215 – 20). Hospital staff noted that Plaintiff had earlier complained to his primary care physician of numbness in the lower extremities, but that diagnostic imaging returned normal results. (R. at 208 – 09, 215 – 20). Plaintiff was recommended for a neurological consultation. (R. at 208 – 09, 215 – 20).

The following day, Plaintiff was evaluated by neurologist Joseph Zayat, M.D., of Westmoreland Neurology in Westmoreland County, Pennsylvania. (R. at 210 – 11). Dr. Zayat reviewed MRI and CT imaging of Plaintiff's brain and found no abnormality. (R. at 210 – 11, 213 – 14). All other diagnostic testing was normal. (R. at 210 – 11). Dr. Zayat noted that Plaintiff complained of right facial numbness for four (4) days. (R. at 210 – 11). Plaintiff was otherwise "very healthy." (R. at 210 – 11). There was no associated pain, but Plaintiff reported that the numbness had spread to the teeth and mouth. (R. at 210 – 11). Physically, Plaintiff was relatively normal. (R. at 210 – 11). Dr. Zayat diagnosed idiopathic right trigeminal neuropathy. (R. at 210 – 11).

Plaintiff returned to Latrobe Hospital on July 6, 2007. (R. at 201 – 06). He complained of headache, dizziness, and numbness on the right side of his face. (R. at 201 – 06). Hospital staff noted that Plaintiff was alert and appeared well. (R. at 201 – 06). Plaintiff again saw Dr. Zayat on July 16, 2007, who noted that Plaintiff's complaints included right sided facial numbness, numbness of the left arm and both legs, and coldness in the left shoulder and arm. (R. at 273). Plaintiff did not complain of weakness, headache, dizziness, or vertigo. (R. at 273).

4

Dr. Zayat referred Plaintiff to neurosurgeon Michael J. Rutigliano, M.D., for further evaluation. (R. at 273).

On August 3, 2007, Dr. Rutigliano assessed Plaintiff and noted that Plaintiff had relatively normal results following a spinal tap and MRI scans. (R. at 222 – 23). However, Dr. Rutigliano noted that Plaintiff's brain MRI showed the existence of a signal lesion of the right pons, which would correlate with Plaintiff's facial numbness. (R. at 222 – 23). A signal lesion was also noted on Plaintiff's spinal cord, which would correlate with left hemibody numbness. (R. at 222 – 23). Dr. Rutigliano felt that these findings were indicative of MS. (R. at 222 – 23). Physical examination revealed Plaintiff to be an otherwise healthy individual in no acute distress. (R. at 222 – 23). Plaintiff's muscle tone and strength were normal, as were his reflexes and gait. (R. at 222 – 23). There was no spasticity, yet there was left hemibody numbness to light touch. (R. at 222 – 23). Plaintiff was recommended for MS-specific treatment. (R. at 222 – 23).

On August 7, 2007, Plaintiff was seen by Michael K. Sauter, M.D., also of Westmoreland Neurology. (R. at 265 – 66). Plaintiff was treated primarily by Dr. Sauter for his MS through August 2009. (R. at 255 – 66, 273 – 74, 311 – 16). During his first examination of Plaintiff, Dr. Sauter noted Plaintiff's past imaging studies' results and Plaintiff's MS-related complaints of numbness and pain. (R. at 255 – 66, 273 – 74, 311 – 16). Dr. Sauter observed that Plaintiff was well-appearing, was alert and oriented, had intact cranial nerves, had slight right facial numbness, had full motor power with no tremor or spasticity, and had a narrow gait without ataxia. (R. at 255 – 66, 273 – 74, 311 – 16). He described Plaintiff as having suffered two MS attacks, and diagnostic imaging revealing two objective lesions affecting the right side of Plaintiff's face as well as the left arm, trunk, and leg. (R. at 226 – 27, 255 – 66, 273 – 74, 311 –

16). He determined that Plaintiff should engage in medication management of his MS. (R. at 255 – 66, 273 – 74, 311 – 16).

Plaintiff thereafter followed up with Dr. Sauter on a regular basis to monitor his progress on medication. (R. at 255 – 66, 273 – 74, 311 – 16). Plaintiff was seen approximately twice per month until November 2007, scaling back to once per month until February 2008, at which point Plaintiff visited Dr. Sauter only once every two months. (R. at 255 – 66, 273 – 74, 311 – 16). Plaintiff was then scheduled to see Dr. Sauter approximately once every four months beginning in June 2008 and lasting until the final treatment note on record in August 2009. (R. at 255 – 66, 273 – 74, 311 – 16). As treatment progressed, Dr. Sauter increasingly noted that Plaintiff's MS was well-maintained on medication. (R. at 255 – 66, 273 – 74, 311 – 16).

Plaintiff's MS was characterized as a relapsing-remitting type. (R. at 255 – 66, 273 – 74, 311 – 16). Dr. Sauter opined regularly throughout the record that Plaintiff never suffered an MS relapse following the initiation of treatment. (R. at 255 – 66, 273 – 74, 311 – 16). Plaintiff's cranial nerves were intact, his motor exams tended to demonstrate that Plaintiff had full strength, and Plaintiff's gait – while generally narrow-based – only improved over the course of treatment. (R. at 255 – 66, 273 – 74, 311 – 16).

Plaintiff did regularly complain of pain and numbness in his face and extremities. (R. at 255 – 66, 273 – 74, 311 – 16). However, Dr. Sauter regularly indicated that Plaintiff was fully independent, and Plaintiff never expressed having any difficulties driving. (R. at 255 – 66, 273 – 74, 311 – 16). Plaintiff was noted to jog routinely until September 2007. (R. at 255 – 66, 273 – 74, 311 – 16). Plaintiff was noted to be working full-time until December 2007. (R. at 255 – 66, 273 – 74, 311 – 16). Over the course of several regularly scheduled visits, Dr. Sauter learned that Plaintiff was applying for disability benefits. (R. at 255 – 66, 273 – 74, 311 – 16).

6

Numerous times, Dr. Sauter opined that Plaintiff was not limited to the extent that he could not work.  (R. at 255 – 66, 273 – 74, 311 – 16).

Specifically, in spite of Plaintiff's subjective complaints, Dr. Sauter stated in December 2007 that he was "not convinced that patient suffers from sufficient debility to require an extended work leave."  (R. at 255 – 66, 273 – 74, 311 – 16).  In February 2008, he stated that Plaintiff's MS was "well controlled," and indicated his disapproval for Plaintiff's disability application when he said, "I do not support [Plaintiff's] pursuit of disability as I do not believe he has enduring deficits that have led to any degree of functional disability."  (R. at 255 – 66, 273 – 74, 311 – 16).  In April 2008, Dr. Sauter explained that Plaintiff's MS was "fairly well controlled," and he stated, "I do not believe that the [Plaintiff] suffers from a functional disability.  Clearly [Plaintiff] suffers from the disease, although this, in and of itself, does not constitute a disability and many people do work in spite of their diagnosis of multiple sclerosis.  I would advise . . . that [Plaintiff] actively pursue employment possibilities."  (R. at 255 – 66, 273 – 74, 311 – 16).

By the end of the treatment record on August 5, 2009, Dr. Sauter indicated that Plaintiff had done fairly well on medication and had seen improvement in his gait; although, Plaintiff complained of fatigue and increased headache.  (R. at 255 – 66, 273 – 74, 311 – 16).  Plaintiff was noted to be well-appearing, was fully alert and oriented, had intact cranial nerves, had full motor strength with minimal spasticity and modest weakness of the left deltoid, had intact fine motor coordination bilaterally, and had no antalgia in his gait.  (R. at 255 – 66, 273 – 74, 311 – 16).  Plaintiff was scheduled to see Dr. Sauter in another four months.  (R. at 255 – 66, 273 – 74, 311 – 16).

### C. Functional Capacity Assessment

On March 3, 2008, a physical residual functional capacity ("RFC") assessment of Plaintiff was completed by state agency physician Gregory P. Mortimer, M.D. (R. at 281 – 87). Dr. Mortimer diagnosed Plaintiff with MS, based upon his review of Plaintiff medical records. (R. at 281 – 87). Specifically, he found Plaintiff limited to occasionally lifting no more than twenty pounds, and frequently lifting no more than ten pounds. (R. at 281 – 87). Plaintiff could stand and walk approximately six hours of an eight hour work day, and could sit approximately six hours. (R. at 281 – 87). Plaintiff could only occasionally climb, balance, stoop, kneel, crouch, and crawl. (R. at 281 – 87). Plaintiff would need to avoid exposure to extreme heat and cold, and hazards such as machinery and heights. (R. at 281 – 87). Plaintiff was not otherwise functionally limited. (R. at 281 – 87). Based upon the contrast between Plaintiff's claimed limitations and pain, and what was recorded by his treating sources, Dr. Mortimer concluded that Plaintiff was less than fully credible. (R. at 281 – 87).

### D. Administrative Hearing

At his hearing, Plaintiff testified that a number of limitations stemming from his MS precluded him from engaging in full-time employment. Plaintiff explained that it was difficult for him to carry more than ten or twenty pounds, to play with his children, to sleep consistently, to remember things, to keep his balance, to bend, stoop, squat, or reach, or to sit, stand, or lay down for a significant period of time. (R. at 39, 42 – 47). Plaintiff's legs were painful and spastic, his left arm was numb and cold, his lower back was sore, his muscles were weak, and he experienced hot flashes. (R. at 39 – 40, 42, 46). Plaintiff also testified that he suffered from a variety of functionally limiting side-effects from his MS medications. These included frequent

changes in weight and flu-like symptoms accompanying his thrice-weekly MS medication injections. (R. at 32, 40 – 41).

Plaintiff described needing a cane to help him walk, although he acknowledged that no doctor had prescribed or recommended such. (R. at 41). Plaintiff was capable of driving, and did so approximately three times a week for up to an hour at a time. (R. at 32, 54). He attended church regularly, and frequently visited friends and family. (R. at 48 – 49). Plaintiff stated that swimming helped to relieve his pain. (R. at 42). Most of Plaintiff's day, however, was spent in the house trying to stay comfortable. (R. at 51). Plaintiff was still treating with Dr. Sauter at the time of his hearing. (R. at 52). Plaintiff claimed that, overall, his MS had worsened with time. (R. at 54 – 55).

Following Plaintiff's testimony, the ALJ asked the vocational expert whether a hypothetical person of Plaintiff's age, educational background, and work experience could engage in a significant number of jobs in existence in the national economy if capable of sedentary work, but limited to jobs involving only routine, repetitive work not performed at a production-rate pace, without requiring exposure to hazards such as heights and machinery, or exposure to irritants such as weather extremes, humidity, or wetness, or more than occasional balancing, stooping, kneeling, crouching, crawling, or climbing, and not requiring climbing of scaffolds, ropes, or ladders, or more than occasional overhead reaching, and allowing the use of a cane as needed, and the ability to alternate between standing and sitting. (R. at 57).

The vocational expert replied that such a person would be capable of working as an "order clerk," with 260,000 positions available in the national economy. (R. at 58). Such a job would allow a hypothetical person fifteen minute morning and afternoon breaks during which he or she could lay down. (R. at 58).

## IV. STANDARD OF REVIEW

To be eligible for social security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F.2d 581, 583 (3d Cir. 1986). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §404.1520(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[3], 1383(c)(3)[4]; *Schaudeck v.*

---

[3] Section 405(g) provides in pertinent part:

*Comm'r Soc. Sec.*, 181 F. 3d 429, 431 (3d Cir. 1999). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. §706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart,* 312 F.3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196 – 97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial

---

Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

4    Section 1383(c)(3) provides in pertinent part:
    The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3d Cir. 1986).

V. **DISCUSSION**

In his decision, the ALJ concluded that Plaintiff suffered from severe medically determinable impairments in the way of MS, headaches, and spurring and bulging at the C5-C6 level of the spine. (R. at 13). The ALJ further concluded that while Plaintiff was capable of sedentary work, his impairments limited him to jobs allowing alternating between sitting and standing at least every hour, and use of a cane to ambulate, requiring no more than occasional balancing, stooping, kneeling, crouching and climbing, but no use of ladders, ropes, or scaffolds, only occasional overhead reaching, no exposure to temperature extremes, humidity, wetness, unprotected heights, or moving machinery, and involving no more than routine, repetitive tasks not performed at a production rate pace. (R. at 14). Based upon the testimony of the vocational expert, the ALJ determined that despite the aforementioned limitations, Plaintiff would still qualify for a significant number of jobs in existence in the national economy. (R. at 21 – 22). Plaintiff was not, therefore, entitled to benefits. (R. at 21 – 22).

Plaintiff objects to the determination of the ALJ, arguing that the ALJ erred in failing to find that Plaintiff automatically met the requirements for disability at Step 3, in failing to find Plaintiff fully credible, and in failing to properly incorporate all of Plaintiff's credibly established limitations into his RFC and hypothetical question. (ECF No. 9 at 13 – 15). As an initial matter, the Court notes that when rendering a decision, an ALJ must provide sufficient explanation of his or her final determination to provide a reviewing court with the benefit of the factual basis

12

underlying the ultimate disability finding. *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981) (citing *S.E.C. v. Chenery Corp.*, 318 U.S. 80, 94 (1943)). The ALJ need only discuss the most pertinent, relevant evidence bearing upon a claimant's disability status, but must provide sufficient discussion to allow the Court to determine whether any rejection of potentially pertinent, relevant evidence was proper. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 203 – 04 (3d Cir. 2008) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000); *Cotter*, 642 F.2d at 706). In the present case, the Court finds that the ALJ adequately met his responsibilities under the law.

Plaintiff first argues that he is entitled to benefits by virtue of meeting impairment listing 11.09 (Multiple Sclerosis) under 20 C.F.R., Pt. 404, Subpt. P, App'x 1. Listing 11.09 provides entitlement to benefits with a diagnosis of:

Multiple sclerosis. With:

A. Disorganization of motor function as described in 11.04B; or

B. Visual or mental impairment as described under the criteria in 2.02, 2.03, 2.04, or 12.02; or

C. Significant, reproducible fatigue of motor function with substantial muscle weakness on repetitive activity, demonstrated on physical examination, resulting from neurological dysfunction in areas of the central nervous system known to be pathologically involved by the multiple sclerosis process.

Plaintiff contends that his subjective complaints of pain and limitation provide sufficient evidence to meet the requirements of the above listings. The Court finds this argument to be without merit for the following reasons.

First, Plaintiff fails to indicate, with any degree of specificity, how his subjective complaints meet any of the above components of Listing 11.09 – particularly with respect to parts A and B, which refer to other listings for guidance regarding what kinds of evidence are

13

expected to support a finding of disability based upon Listing 11.09. Second, and more importantly, Plaintiff fails to point to any error committed by the ALJ in rejecting Plaintiff's subjective complaints of pain and limitation – subjective complaints which, as just discussed, may or may not even meet the listings based upon the definitions provided under 20 C.F.R., Pt. 404, Subpt. P, App'x 1.

Moreover, in rejecting the possibility that Plaintiff may have met Listing 11.09, the ALJ cited specifically to a lack of objective medical evidence providing statements to the effect that Plaintiff meets a listing or components of a listing. (R. at 14). The ALJ refutes many of Plaintiff's subjective complaints of pain and limitation by reference to Plaintiff's long-time treating physician – Dr. Sauter. (R. at 14 – 20). Over nearly two years of treatment records, not only did Dr. Sauter not indicate that Plaintiff suffered pain and limitation as severe as Plaintiff claimed, but Dr. Sauter explicitly stated in direct reference to Plaintiff's attempt to seek disability benefits that Plaintiff was not functionally disabled. (R. at 14 – 20). As such, the decision of the ALJ not to find Plaintiff disabled at Step 3 was more than amply supported by substantial evidence.

With respect to Plaintiff's final two arguments regarding the ALJ's failure to find Plaintiff fully credible and to accommodate all claimed limitations in his RFC and hypothetical question, it is clear to the Court that Plaintiff failed to provide any objective medical evidence to support the full severity of what he claimed – particularly when looking at the findings of Plaintiff's treating physician, Dr. Sauter. In light of the above discussion, it is clear that the ALJ provided a thorough analysis of the medical evidence underlying Plaintiff's claim for disability benefits. This Court can conclude nothing other than that all the credibly establishing medical impairments suffered by Plaintiff were properly incorporated into the hypothetical to the

vocational expert and were accommodated fully in the ALJ's RFC assessment. Therefore, Plaintiff's subjective complaints were not given improper weight, and the ALJ's hypothetical and RFC assessment were not flawed.

**VI.   CONCLUSION**

It is undeniable that Plaintiff has a number of impairments, and this Court is sympathetic and aware of the challenges which Plaintiff faces in seeking gainful employment. Under the applicable standards of review and the current state of the record, however, the Court must defer to the reasonable findings of the ALJ and his conclusion that Plaintiff is not disabled within the meaning of the Social Security Act. The Court finds that the ALJ provided sufficient justification from the medical record to allow this Court to conclude that substantial evidence supported his decision.

For the referenced reasons, the Court will grant the Motion for Summary Judgment filed by the Commissioner and deny the Motion for Summary Judgment filed by Plaintiff.

An appropriate Order follows

McVerry, J.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GARY L. STOUFFER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 02: 11-cv-00096 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER OF COURT

**AND NOW**, this 7th day of February, 2012, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED, AND DECREED** that:

1. Plaintiff's Motion for Summary Judgment is **DENIED**.

2. Defendant's Motion for Summary Judgment is **GRANTED**.

3. The Clerk will docket this case as closed.

BY THE COURT:

s/ Terrence F. McVerry
United States District Judge

cc: Jessica L. Rafferty, Esq**.**
QuatriniRaffrety, P.C.
Email: jlr@qrlegal.com

Albert Schollaert
Assistant U.S. Attorney
Email: albert.schollaert@usdoj.gov